Filed 1/13/14  In re I.V. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re I.V., a Person Coming Under the Juvenile Court Law. | H040046 (Santa Clara County Super. Ct. No. JD15015) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. D.V., Defendant and Appellant. | |

D.V., mother of I.V., a dependent child of the court (Welf. & Inst. Code, § 300), requested the addition of unsupervised weekly visitation with I.V. at the time of the six-month review.[1]  She now challenges the juvenile court's conditional grant of her request. We discern no abuse of discretion and affirm.

---

[1]  All further statutory references are to the Welfare and Institutions Code.

1

## I.

### *Procedural History*

A. *Prior Dependency Proceeding*

An earlier dependency proceeding was commenced when minor I.V. was an infant. On December 5, 2003, a juvenile dependency petition was filed on behalf of I.V. A first amended petition was filed on his behalf on December 10, 2003.

A second amended petition was filed on I.V.'s behalf on January 23, 2004. Among other things, it alleged that I.V. had received a positive toxicology screen for amphetamine at the birth hospital. I.V. had been released to mother with informal supervision (IS) services but mother had failed to substantially comply with the terms of the IS agreement, failed to complete an out-patient drug program, failed to consistently drug test, and failed to complete a parenting drug class. She had multiple positive drug tests for amphetamine after I.V. had been released to her. I.V. and three older children had been taken into protective custody on December 8, 2003. Two of those other children had been exposed to domestic violence in that they were in the home when the father of one of those two children had raped mother. That man was incarcerated for the beating, rape and kidnap of mother.

On February 6, 2004, the juvenile court found the allegations of the second amended juvenile dependency petition to be true and found minor I.V. to be a child described by section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling). It adjudged him to be a dependent child of the Santa Clara County Superior Court.

The juvenile court ordered I.V. committed to the Department's care, custody and control for placement in a suitable relative home or foster home. It ordered reunification services for mother. Mother was required to participate in and successfully complete a basic parenting class addressing the effects of substance abuse on parenting and a program of counseling or psychotherapy addressing domestic violence and surviving the trauma of rape. She was ordered to participate in and successfully complete a 12-step

2

substance abuse program at least once a week and to provide proof of attendance and contact information of a sponsor. She was also required to participate in and successfully complete an "aftercare drug treatment program" as recommended by the substance abuse program or supervising social worker. It appears that mother was also required to participate in a "DV" (domestic violence) support group.

Minor was eventually returned to mother with family maintenance services. In July 2005, after mother relapsed, the court approved I.V.'s placement with mother at House on the Hill (HOH), a residential treatment facility. This dependency proceeding was ultimately dismissed on April 5, 2006.

B. Current Dependency Proceeding

Dependency Petition

On October 23, 2012, when I.V. was nine years old, a new dependency petition was filed on his behalf. A first amended petition was filed on December 3, 2012.

The first amended petition alleged that mother had been arrested on September 26, 2012 for violating probation by failing to comply with her Proposition 36 requirements. Mother had made arrangements for I.V. to remain with the maternal grandmother but the grandmother could not care for I.V. due to his emotional needs and her medical needs. On October 19, 2012, I.V. was placed into protective custody "due to caretaker absence after the mother . . . was incarcerated."

The petition stated that I.V. had been born with a confirmed positive toxicology screen for amphetamines and barbiturate. Mother had failed to substantially comply with the terms of the 2003 IS agreement.

It alleged that mother had "a serious long term substance abuse problem spanning the last ten years." Mother had received voluntary family maintenance services from December 18, 2006 to June 18, 2007 and from May 2011 through November 2011. Mother's substance abuse nevertheless continued. During 2007 to 2011, mother "repeatedly placed the child, for extended periods of time[,] with the former foster

3

parents and the maternal grandmother, due to [mother's] inability to manage [I.V.'s] behaviors."

The petition stated that mother's boyfriend, with whom she was living at the time of her arrest and who is the father of I.V.'s half-sister A., also has a substance abuse problem. In addition, he is "a [section] 290 Sexual Registrant." Mother's "live-in partner relationships have all been characterized by domestic violence and drug use." Her children had witnessed domestic violence. I.V. had been "beaten by a least one of her previous partners."

It alleged that mother was "unable to meet the child's needs in that the child was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder in 2011 and was prescribed medication." After the family's IS case was closed in 2011, "mother stopped providing the child with his medication," which resulted in I.V. exhibiting behavior problems. Those issues included "inappropriate behavior, inability to focus, inability to follow rules, and constant class disruption . . . ." "[T]he lack of medication interfered with [I.V.'s] ability to learn the classroom material" and he was "currently below grade level . . . ."

Additionally, the petition stated that I.V. had a serious heart condition for which mother had neglected to seek consistent and appropriate treatment. She had canceled a scheduled surgery in August 2011 and she had never rescheduled.

The petition also alleged that two older half-siblings of I.V. (D.C. and I.M.) had been previously removed from mother's care and the maternal grandmother was later appointed as their guardian. Another half-sibling had been placed with his father out of state and mother was not involved in his care or custody.

It stated that the identity and whereabouts of I.V.'s father was unknown.

4

*Jurisdiction/Disposition Report and Orders*

The jurisdiction/disposition report, dated December 10, 2012, described the extensive prior child welfare history. It stated the factual basis for the petition's allegations.

It disclosed that mother has six children fathered by six different men. I.V. had three older half-siblings and two younger half-sisters, six-year-old J. and three-year-old A. Mother's "relationships have been marked by extreme domestic violence . . . ." Mother had "a long history of substance abuse that has been resistant to treatment and a history of involving herself in relationships that are characterized by domestic violence." Mother indicated that she was using drugs again from the time A. was born in 2009 until her incarceration in 2012, except during voluntary family maintenance during 2011.

The report specified that mother had been incarcerated on a probation violation; she was subsequently released from custody and she entered in-patient treatment at HOH on October 31, 2012. At the time of the report, mother was residing at HOH with her youngest daughter A.

The report indicated that I.V. had been diagnosed with ADHD and oppositional defiant disorder. He also had suffered from aortic stenosis, a heart condition. He had been scheduled for a heart procedure but the surgery was cancelled; mother had given various explanations for the cancellation. The report stated that I.V. had "challenging medical, emotional, psychological and academic needs."

The report indicated that in December 2008, the maternal grandmother was appointed guardian of I.V. I.V. returned to living with his mother in August 2009 partly because his maternal grandmother could not manage his behaviors. According to the report, the court suspended the guardianship, specified that I.V. would reside with mother, and directed mother to enroll herself in a drug program and enroll I.V. in counseling.

5

The Jurisdiction/Disposition Report recommended that mother and I.V. receive family reunification services.

The juvenile court found the allegations of the first amended petition were true and found I.V. was a child described by section 300, subdivisions (b) (failure to protect) and (g) (no provision for support). The court again declared him to be a dependent child of the court. It ordered I.V. to continue under the Department's care, custody and control for placement with a foster home. As to visitation, the court ordered mother to have a two-hour, supervised visit with minor at least once a week.

The court ordered family reunification services for mother and I.V. Mother was ordered to participate and successfully complete a Parent Orientation Class, a Parenting Children with Challenging Behaviors class, and a program of counseling or psychotherapy addressing "[t]rauma, self-esteem, developing a support network, health [sic] relationships, and living drug and alcohol free." She was also ordered to submit to drug and alcohol testing once a week and on demand and to attend and complete a 12-step (or other substance abuse self-help) program at least three times per week and to provide written proof of attendance. She was required to obtain a program sponsor and provide contact information to the social worker. Mother was directed to undergo a substance abuse assessment and participate in and complete the drug treatment programs recommended in the assessment. The court also required mother to participate in and complete an "aftercare drug treatment program as recommended by the substance abuse treatment program and/or supervising social worker" and to develop "an aftercare relapse prevention plan and submit it to the supervising social worker." She was ordered to participate in a "closed-curriculum based domestic violence victims' support group."

*Interim Review Hearing*

In an interim review report, dated February 7, 2013, Social Worker Sara Meendering reported that I.V. had changed foster homes and she indicated that I.V.'s "therapeutic and medical needs" needed to be "a primary focus" of the dependency. I.V.

6

had been "experiencing severe emotional and behavioral concerns after visits with his mother." Mother had "repeatedly [made] statements regarding coming home, doing overnight visits, and making promises to [I.V.], despite being told not to." The social worker reported that mother was "known to involve [I.V.] in her personal struggles, which has negative affects [sic] on [I.V.'s] health and well-being."

After a visit with mother in January 2013, I.V.'s behaviors had "escalated in the foster home" and he had engaged or attempted to engage in self-harming behaviors and made statements about running away and killing himself. A crisis team was called to his foster home several times during the week following the visit, the last of which resulted in I.V.'s hospitalization and placement "on a 5150 psychiatric hold." Upon his release from the hospital, I.V. was placed in "an EMQ 60 day professional parent foster home with Receiving Center Stabilization Team (RCST) services in place." At the time of the report, I.V. was "currently doing very well in this home."

I.V. had not visited with mother since his psychiatric hospitalizations because his behaviors needed to stabilize. A safety and support plan had been developed to allow I.V. to resume visits with mother. The plan involved a social worker transporting I.V. to HOH, supervising the visit there, and then immediately bringing I.V. to his therapist for an hour of therapy.

Mother was in the residential drug treatment program at HOH, where she resided with A. At HOH, mother was regularly attending 12-step meetings and she was attending a Celebrating Families parenting class held there. She was participating in Dependency Wellness Court. The report indicated that after mother exited from HOH, mother would be able to receive therapeutic services with "Victim of Crime compensation funding."

*Six-Month Review*

In the status review report for the six-month review hearing, dated May 16, 2013, Social Worker Sara Meendering reported that I.V. had transitioned to a non-relative extended family member (NREFM) on March 8, 2013 but on March 26, 2013, the

7

NREFM requested the Department to immediately remove I.V. because he was bullying her son. I.V. was returned to the foster home in which he resided prior to his psychiatric hospitalization.

According to the report, mother had moved from HOH to a transitional housing unit (THU) in late March 2013. She still was on criminal probation and participating in Dependency Wellness Court.

I.V. was seeing a cardiologist for his aortic stenosis. He was otherwise in good physical health.

I.V. had qualified for special education services and he had an IEP (individualized education plan). Therapeutic Behavioral Services (TBS) coaches were working with I.V. in the classroom. Minor's behavior had improved since being prescribed medication.

As to I.V.'s mental health, he was engaging in weekly individual therapy and his therapist was also holding family sessions and consulting with his foster parents. His therapist had "attempted to engage [mother] in family sessions" but mother had "not returned her phone calls."

Social Worker Meendering had provided mother with a list of therapists that accepted "Victim Witness funding" on February 12, 2013. In March 2013, mother indicated that she had not made a "good connection" with the therapist she had found; Meendering instructed her to pursue other therapists on the list. As of the time of the six-month review report (May 2013), however, mother had not yet found another therapist.

The report further indicated that mother had been referred to a parent orientation class but she had not yet enrolled. Mother was attending a Celebrating Family substance abuse parenting class and had been referred to a Parenting Children with Challenging Behaviors class. Mother was complying with drug testing and she had been regularly attending 12-step meetings, she was on the second step of the program, and she had a sponsor. She was currently attending outpatient drug treatment twice a week and

8

working on a relapse prevention plan. Mother was on the waitlist for a domestic violence victims' support group.

The report indicated that mother began visiting I.V. at Kindred Souls at the end of February 2013. Mother generally obtained a score of "3" or "3.5" out of "5" for appropriateness. Mother indicated visitation was difficult for her and I.V. became anxious in the visitation room. She had requested that they "be provided with a YCMA [sic] membership or other semi-structured activity to engage in during visits." In addition to their visits, mother interacted with I.V. during a weekly Celebrating Families class at HOH.

According to the six-month review report, a TBS coach had reported on April 25, 2013 that mother and I.V. had a difficult time during a Celebrating Families class. When the coach arrived to pick up I.V., mother was in tears and she related that I.V. had said to her, " 'You're not my mom, you're a drug addict.' " Mother told the coach that she was not going to continue fighting for I.V. because she did not believe that she would be able to control his behavior; the TBS coach reported that mother's statement had been made within earshot of I.V. I.V. then had gotten into a van with his sisters and refused to get out. It took mother about 10 minutes to calm him down.

The report also indicated that mother had made inappropriate promises to I.V. during their visits that caused him emotional distress and, consequently, in mid-February 2013, the social worker had provided mother with guidelines for visitation, which included not making promises to I.V. about coming home or the future. Nevertheless, upon returning to his foster home after a Celebrating Families class on May 2, 2013, I.V. reported that mother had said he could have a dog when he came home and she had made other statements about being home with his sisters.

The social worker concluded in the report that it would be detrimental for I.V. to return home at that time. Mother had "a very long history of substance abuse and periods of recovery" but she was unable to support long term recovery despite many services.

9

Mother was still in a romantic relationship with A.'s father, who was on the "National Sexual Offender Registry, ha[d] a known criminal and substance abuse history, [was] a domestic violence perpetrator, and ha[d] been known to be emotionally and physically abusive toward [I.V.]." I.V. did not wish to have any relationship with him and the social worker expressed concern that mother's romantic relationship appeared "toxic to [mother's] emotional and physical safety."

Mother had been inconsistent with respect to "meeting with Rebekah Children's Services staff and maintaining contact with [I.V.'s] therapist." Mother had admitted worrying that I.V.'s behaviors might be too difficult for her to manage. The social worker stated that mother "appears to be triggered by [I.V.'s] negative behaviors and experiences frustration when she is not able to control him."

The report recommended continued family reunification services and a minimum of once-a-week, supervised visitation.

An addendum report, also dated May 16, 2013, indicated that mother had not followed the visitation guidelines. A visitation report from Kindred Souls was attached to the addendum report. The visitation report related that, during a visit on May 8, 2013, mother told I.V. that she would like his sister J. and him to go to the same school because mother would be attending school and indicated that the plan and goal was for them to be together the next year.

A six-month review was held on May 16, 2013; the court resolved all issues aside from the question of visitation. The parties were referred to mediation with respect to that issue but mediation was not successful. An early resolution conference on the issue of mother's visitation was scheduled for July 15, 2013.

In an addendum report, dated July 15, 2013, Social Worker Meendering recommended that the court make a visitation order providing for supervised, two-hour visits twice a week. Mother had been visiting with I.V. that frequently since June 21, 2013.

10

The addendum report disclosed that, at a Child Family Team meeting on June 14, 2013, mother admitted to Social Worker Meendering that she had been driving her van without a valid driver's license and with a car seat for only one of her daughters. Mother explained that the bus took a very long time to get to the meetings and she did not have money to buy a bus pass for her six-year-old daughter. Meendering cautioned mother regarding the risks of her behavior.

According to the addendum report, I.V. had successfully undergone a balloon angioplasty to treat his aortic stenosis on July 2, 2013. Mother, a foster parent, and the social worker Sara Meendering were present at the preoperative appointment on July 1, 2013 at the hospital. The hospital staff informed them that no children were allowed at the hospital because patients needed a calm and quiet environment. Due to echocardiogram results, I.V. was admitted to the hospital that day, instead of the next day as planned. Foster mother reported that mother invited I.V.'s younger sisters and a NREFM and the NREFM's child into I.V.'s room and everyone sat on I.V.'s bed. Foster mother stated that they were "quite loud, disruptive, and upsetting to [I.V.]." "She reported that at one point, I.V. become upset with his sister, threw a blanket over his head, and started crying."

It was also reported that mother's attendance at family therapy sessions had been sporadic. Mother had failed to appear for the July 9, 2013 therapy session with I.V. and he was disappointed because he was expecting her. Mother had not yet engaged in individual therapy.

The addendum report stated that mother had informed Social Worker Meendering that she intended to request unsupervised visitation at the early resolution conference scheduled for July 15, 2013. In the report, the social worker concluded that unsupervised visitation would be premature at that time. The social worker remained concerned about mother's appropriateness and ability to control I.V.'s behavior during visits. Mother continued to make inappropriate decisions regarding minor's needs; she had ignored the

11

doctor's preoperative advice regarding providing a calm environment for I.V. and she had given a higher priority to "the desire of others to visit with him." Mother had also put her children at risk by driving without a driver's license and an appropriate car seat. The social worker stated that mother and I.V. "need[ed] to continue engaging in family therapy so that [mother] can gain the skills and knowledge . . . to manage [I.V.'s] behaviors without both of them getting emotionally triggered."

The early resolution conference did not resolve the question of mother's visitation and a contested hearing was set for August 6, 2013 on mother's request for at least one unsupervised visit per week.

*Contested Hearing Regarding Visitation*

On August 6, 2013, the court held a contested hearing on the narrow issue whether the court would grant mother any unsupervised visitation. At that point in time, mother was being allowed supervised, two-hour visits twice a week.

The Department was opposed to any unsupervised visitation. The Department asked the court to consider the May 16, 2013 report and the addendums.

The Department called Sara Meendering as a witness. The Department's counsel and mother's counsel stipulated that Meendering was an expert in risk assessment.

Meendering testified that minor's "very high needs" were her biggest concern with respect to unsupervised visitation. I.V. recently ran off when he became upset and the foster mother had to call the police. Many of his behaviors, such as self-harm and aggression toward peers, required therapeutic attention. In a supervised setting, someone could intervene. Mother's visits with I.V. included I.V.'s two little sisters and mother had a lot to handle with the three children. There had not been any incident, however, because the visits had taken place in a highly supervised setting.

Meendering testified that mother and minor could "trigger each other." Meendering had seen mother become frustrated when she was with I.V. and not know what to do when minor's behavior escalated; professionals had to be called in to assist.

12

During the April 2013 incident at Celebrating Families, mother had indicated that it is difficult for her when I.V.'s behavior escalates and mother did not know whether she would be able to handle his behaviors or whether reunification would be possible. Meendering acknowledged that, since April 2013, there had been no instances where she felt mother was unable to de-escalate minor's behavior but Meendering stressed that all the visits had taken place in a highly supervised setting where a professional therapist could intervene.

Meendering had considered non-professional supervision by the maternal grandmother but Meendering had concerns about her. The grandmother had decided not to have minor visit her the previous Saturday night but the grandmother had failed to inform the foster mother and she had relied on mother to pass on that information. That lack of communication had caused minor to become upset and run off. The maternal grandmother and mother had a history of an adversarial relationship, which ran "very hot and cold." Mother's relationship with her family had been a trigger for relapse. Meendering did not want minor to get caught in the middle of those issues.

Mother was not engaged in individual therapy. Meendering had given mother a referral for individual therapy and advised mother to begin working on issues of domestic violence, substance abuse, and past family trauma.

Mother was participating in family therapy with minor, which was scheduled for every other week. The therapist had wanted to see mother and minor every week but mother had refused, saying that it would be difficult to meet weekly because of her schedule.

On cross-examination, Meendering described the previous weekend's incident in greater detail. After a visit with his former foster mother T.B., which the current foster mother had permitted and which Meendering knew about and was "okay with," minor refused to get into the car with his current foster mother. Minor wanted to attend a party that his former foster family was hosting. Minor's current foster mother called the

13

maternal grandmother to find out if minor could visit with the grandmother after the party but the maternal grandmother would not talk to her. The grandmother called mother who relayed the message that the visit with the grandmother was cancelled. Minor became very upset and ran off. His current foster mother unsuccessfully attempted to get minor into the car and then called the police. Minor did not listen to the police and it took a very long time to get him into the car. Minor's foster mother needed her boyfriend's assistance to calm down minor.

Social Worker Meendering indicated that she did not think that mother would be capable of handling such a situation. The foster mother, unlike mother, was a highly trained foster parent with the skills to handle the toughest kids in the county. Mother had been unable to follow the visitation rules provided by Meendering. Meendering did not think that calling the police would be a good option to use on a regular basis.

Meendering did not think that mother was prepared for unsupervised visits with minor because mother had not made any progress in her visitation scores. She thought it was "really important" for mother to engage in individual therapy to enable mother to "identify her own triggers" and understand what was going on inside. Meendering was happy that mother was attending family therapy once every other week but pointed out that the therapist had recommended weekly therapy and minor had experienced family trauma that "need[ed] to be worked on very intensely." Meendering acknowledged that mother was compliant with her court-ordered case plan.

Before recommending unsupervised visits, Meendering would need to see less intervention from the therapist during visitation, particularly when the girls were present, mother would have to receive higher scores from Kindred Souls, and mother would have to engage in her own individual therapy and increased therapy with minor. She would also have to see that minor's behavior was not creating such a risk for his safety. She indicated that he was difficult even for trained foster parents to manage because his

14

behavior posed a risk of harm to himself or his peers. Mother's sobriety was not an area of concern at the time of the hearing.

Mother's exhibit, the Kindred Souls visitation logs, was admitted into evidence. T.B. was called as a witness for mother.

T.B. testified that she was currently a licensed foster care parent through Santa Clara County but I.V. was not presently in her care. I.V. was her foster son from the time he was about eight months old until he was 18 months old. He returned to her when he was four years old but, when he was five years old, I.V. went to live with his grandmother. When I.V. was seven years old, he spent every weekend and most of the summer with her. She had been in consistent contact with minor since he was about seven years old.

For about three weeks in March 2013, T.B. tried to maintain I.V. in her home but she was not able to manage. T.B. explained that she had a "hard time dealing with his behavior." At that time, she also had her own son, who was eight years old, and I.V.'s sister J., who was six years old. She had to repeatedly put those children in a bedroom and lock the door because I.V. was trying to physically hurt her son. When I.V. became upset, his sister became scared and cried. I.V. liked to hang out with his sister and he was protective of her but they also had jealousy issues and butted heads. When T.B. called for support at night during that period in March 2013, she was told that "they were understaffed and had no one to help" her.

The Thursday before the contested hearing, I.V. had called T.B. and asked to "hang out" with her. I.V. spent that Thursday visiting T.B.'s family and he ended up staying overnight and leaving Friday morning. It was the first time T.B. had seen him since March. I.V. returned the following Saturday morning to attend a birthday party for T.B.'s nephew. The current foster mother had previously told T.B. that I.V. was supposed to see his grandmother that afternoon. T.B. testified that, after the foster mother dropped I.V. off at her home on Saturday, mother called and told I.V. that the

15

visit with his grandmother was cancelled. The change in plans did not seem to impact I.V., who said, "Oh that's fine; it's no big deal." Then I.V.'s foster mother called T.B. to tell her that the grandmother had cancelled the visit because the grandmother had plans for the afternoon and she had wanted I.V. to come in the morning. Minor stayed with T.B.'s family through Sunday and there was never a time that T.B. felt that she needed clinical support.

When the foster mom came to pick up I.V. on Sunday, I.V. refused to go. T.B. packed up minor's belongings, she told him that he needed to go, she walked him out to the car, she told him to put on his seatbelt, and she watched the foster mother drive away. The foster mother's boyfriend later called to ask whether I.V. had taken his medication yet and T.B. told him no. T.B. learned only the morning of the hearing that the police had been called.

T.B. indicated that she knew I.V.'s mother because of her own relationship with minor. When I.V. was an infant, the Department had asked her if she would be willing to monitor visitation between I.V. and his mother but the social worker decided it "might not be a good idea" because of the possibility of adoption if he was not returned to mother. T.B. indicated that she was willing to supervise visits between minor and his mother but now the issue was her schedule.

T.B. described what had occurred during her visit with I.V. on July 1, 2013, the date he was admitted to the hospital for his heart procedure. T.B. and her son and mother and her two daughters visited with I.V. in the hospital for about an hour and a half. She described mother's interaction with I.V. as "normal" and "playful"; mother was "trying to keep minor's spirits up."

Over the years, T.B. had observed mother's and I.V.'s relationship. Recently, mother had been "really loving and caring" in T.B.'s view; mother had been "showing more interest in her children's education" and "putting effort into being a supportive mom." Aside from the visit at the hospital, T.B. had last observed minor interacting with

16

his mother for five or 10 minutes in March 2013 when she brought minor to a facility for a supervised visit and they were in a waiting room together.

During the three weeks in March 2013 when T.B. had minor in her care and she was unable to handle minor's behaviors at bedtime, she sometimes called mother for help in deescalating minor's temper tantrums and he would usually be willing to talk with mother on the speaker phone and this often helped him relax. T.B. believed mother's comments to calm minor were appropriate. She agreed with the estimate that out of about 14 calls, mother was unable to calm minor about one or two times.

T.B. supported mother's request for unsupervised visitation. She stated: "[I.V.] has a hard time trusting his mom because of the ups and downs in the relationship. I know that by having more visitation he'll be able to see that his mom is doing better and is able to take care of him and . . . be a good mom to him."

Mother testified that she was requesting unsupervised visits so she could have her son more often. Mother met with Meendering, her son's support team, and the current foster mom at weekly Friday meetings. According to mother, social worker Meendering had never supervised a visit.

Mother's visits were occurring twice a week for two hours each and included her two daughters, who were then three and seven years old. Their visits had been taking place at Kindred Souls since April or March 2013 until about a month and a half before the August 6, 2013 hearing. At that point, visits began occurring at EMQ.

Mother had received ratings of "3" and "3.5" out of "5" for the visits at Kindred Souls. She understood that the lack of improvement in her scores was the reason for social worker Meendering recommending against unsupervised visitation. She indicated that she had received a "3" on one occasion because I.V. was having a grouchy day.

Mother believed that more visits with I.V. would help build trust between them. It would show him that she loved and cared about him, she wanted to be part of his life, and she would not give up on him. Mother thought that she could manage his behaviors. She

17

explained that when he became upset or things did not go his way, he would run away. He sometimes isolated himself or started acting out. Mother said that she had learned how to talk with him and he seemed to calm down when she spoke to him. Sometimes giving him a little space worked. She would tell him, "Just like mommy needs to take a time-out sometimes, you need to take a time-out, too. . . ."

Mother remembered the April 2013 incident when I.V. and she had become upset with each other at a Celebrating Families session in April 2013. Mother explained what had happened. A. had been crying and mother had told I.V. that she was going to stay with A. until A. stopped crying; mother told I.V. to go to his class. I.V. had "taken off running." When mother found him, minor was angry and told mother that he hated her; mother took it personally and was hurt. Afterward, mother had told the Children's Services TBS Coach that she was not going to continue fighting for I.V. because she did not believe she could control his behavior. Mother denied making that statement in front of I.V. Mother reported that, later that same night, I.V. called mother and told her that he loved her. Mother said that, since that incident, she had learned not to personally take statements made by minor in anger.

Mother disagreed with the social worker's assessment that minor's behavior was a trigger for her. She denied that she became stressed when minor acted out. She was not yet participating in individual therapy but she represented that she was looking for a therapist and waiting for her domestic violence class to end on the 27th of the month. Mother had been seeing a therapist at HOH but, according to mother, therapy there was limited to domestic violence because funding was through "Victim Witness."

Mother was participating in family therapy and had missed only one session. She complained that I.V. had not connected to and did not like the therapist. She had told the family therapist that she wanted to meet only every other week because "transportation was hard." She said that she would be willing to go every week now.

18

Mother said that, if she were granted unsupervised visitation, she would play with I.V., "[r]ent a good cartoon movie" to watch together, and make dinner for him. She did not have a working car and she planned on staying with him on site at the THU. She stated the THU had a playroom, a big backyard, and a basketball court.

Mother wanted the court to know that allowing unsupervised visits would provide the opportunity for her to show that she could handle I.V. She was doing everything required of her, she was going to class, participating in Celebrate Recovery, she was going to church twice a week, and she had been accepted into Home Safe, a place where she could live with her children for three years. Mother said she was working on herself so she could be a better mother to I.V. and she was trying to prepare for reunification. Mother would be "clean" for a year as of September 19, 2013.

On cross-examination, mother admitted that she had missed her visit with I.V. on the previous Wednesday. She said the reason was transportation.

Mother acknowledged that the doctor had instructed that no younger children could be present at the hospital on the day of I.V.'s surgery but he did not say anything regarding the day before his surgery. She explained that, on the day before his surgery, I.V.'s foster mother had taken her to the hospital and she had to ask T.B. to pick her up because she had no one else to call. T.B. came with her own son and mother's two daughters. Mother denied that anyone at the hospital had reprimanded her for allowing her daughters, T.B., and T.B.'s son into I.V.'s room before his heart procedure. Mother denied that I.V.'s current foster mother told her that the children were not supposed to be at the hospital. Mother acknowledged that the foster mother had told T.B. that the children could not stay after 6:00.

Mother recognized that there were still things that she needed to work on with I.V. She was addressing trust issues by participating, going to visits, talking with I.V., and showing she loved him. She agreed that his running away was a behavior of concern. Other areas of concern were I.V.'s temper, his ability to deal with feelings, and his acting

19

out. Mother was aware that I.V. had previously threatened to kill himself and she gave some examples of self-harming behavior, such as trying to choke, hit, and scratch himself. Mother was unaware that I.V. had injured himself by climbing poles or high structures and jumping off.

As to the April 25, 2013 incident at Celebrating Families, mother confirmed that her daughter A. was in class while she was talking to minor after he had run away.

Mother did not recall I.V. saying to J., "I hate you, [J.]," during a visit with him at Kindred Souls on June 26, 2013. The Kindred Souls visitation report reflected that I.V. had made that statement and he had said that he did not want J. at visits and wanted her to leave. Mother remembered I.V. getting mad about a game. Mother acknowledged that I.V. had gotten upset "a lot of times" "because [J.] is winning or she wants to play the same game as him." Mother indicated that, in those situations, she tells I.V. that he is not being nice and he needs to apologize. Mother asserted that, when I.V. knows that he has done something wrong to his sisters and made them cry, he apologizes afterward.

Mother acknowledged that A. and J. were currently in her care full time and would be present at any unsupervised visits with I.V. Nevertheless, she had no concerns about interactions between the three children. Mother was asked what she would do if the children fought and I.V. left the THU. She responded that she would try to see where he was and talk to him. Mother indicated that, if she could not see him, she would probably then call whatever emergency number she had been given or the police. She did not think something like that would happen. She acknowledged that if she went out looking for minor, she would have to bring the girls with her.

Mother thought it would be hard on I.V. if something occurred during an unsupervised visit and they had to return to only supervised visits; minor would feel at fault. Mother nonetheless believed that any recommendation against unsupervised visits by the social worker did not give her a chance to prove that she was able to handle I.V. and worked against reunification.

20

Mother confirmed that I.V. was supposed to be on medication for ADHD but she did not know the name of the medication. She thought he also had been diagnosed with "detachment disorder" and something else. She was willing to learn more about his diagnoses.

At the close of the hearing, counsel for the Department and counsel for minor argued against unsupervised visitation. Mother's counsel argued in favor of it. The matter was taken under submission.

On August 8, 2013, the juvenile court stated that, in addition to hearing the testimony of the witnesses, it had read and considered the May 16, 2013 report and the May 16, 2012 and July 15, 2013 addendums. In reaching its decision, the court considered the fact that the 12-month review was coming up in November 2013, I.V. had "some pretty serious behavioral and emotional needs," mother had received periods of informal supervision, and this was I.V.'s second dependency. It ordered mother to participate in weekly family therapy and begin individual therapy. It indicated that with the additional family therapy and the opportunity to begin addressing her personal issues in individual therapy, mother would "be in a better place to have those unsupervised visits." The court ordered the Department to add a third weekly visit, consisting of a two-hour unsupervised visit, once mother was participating in weekly family therapy, she was engaging in individual therapy, and she had completed six sessions of individual therapy, provided that she continued to test clean. It required the unsupervised visits to take place at only mother's placement, which provided "a contained setting to minimize any risk to [I.V.'s] health and wellbeing." The court confirmed that the Department retained discretion to liberalize visitation at an earlier time.

## II

### *Discussion*

Mother asserts that the court acted arbitrarily when it denied her request for unsupervised visitation with I.V. We view the juvenile court's order as a conditional

21

grant, rather than as an outright denial, of her request to have at least one unsupervised weekly visit with I.V. Its visitation order was not arbitrary or unreasonable based on the evidence before it.

"During reunification efforts, visitation generally must be as frequent as possible, consistent with the well-being of the child. (§ 362.1, subd. (a)(1)(A).) At the same time, visitation orders must provide for 'flexibility in response to the changing needs of the child and to dynamic family circumstances.' (*In re S.H.* (2003) 111 Cal.App.4th 310, 317.)" (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356; see Cal. Rules of Court, rule 5.695(h)(5).) "No visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B).) The court exercises its judicial discretion in determining the frequency and length of visitation and in imposing conditions or further requirements with respect to visitation. (See *In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757; see also *In re R.R.* (2010) 187 Cal.App.4th 1264, 1284-1285 [juvenile court did not abuse its discretion by ordering monitored visits].)

" 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) A juvenile court exceeds the limits of its legal discretion if its determination is arbitrary, capricious or patently absurd. (See *id.* at p. 318.)

While mother was compliant with her case plan, there was also evidence that I.V. had special emotional needs and engaged in some challenging behaviors and mother sometimes did not appropriately react to I.V.'s behaviors and sometimes did not exercise good judgment with respect to him. The social worker's testimony suggested that weekly family therapy and individual therapy were necessary to prepare mother for unsupervised visitation and strengthen her ability to appropriately cope with and respond to I.V.'s problematic conduct. Mother has not shown that the court's requirements that mother

22

engage in family therapy on a weekly basis and have six sessions of individual therapy under her belt before proceeding with weekly unsupervised visits were unreasonable under the circumstances. The juvenile court could reasonably conclude that those conditions would be protective of I.V. and supported the likelihood of successful unsupervised visits going forward. Under the court's order, mother was entitled to a weekly unsupervised visit with minor, in addition to the two weekly supervised visits, once she complied with the conditions.

Although mother claimed that the court's order was "illusory" because of her economic situation and lack of financial resources to retain a private therapist, she did not provide any evidentiary support for those assertions. As to individual therapy, social worker Meendering had provided mother with a list of therapists that accepted Victim Witness funding in about mid-February 2013. At the hearing on August 6, 2013, mother did not establish that those therapists would *not* satisfy the individual therapy requirement and she had no viable option to meet that requirement because she lacked adequate financial resources or assistance.

In addition, I.V.'s therapist had recommended weekly family therapy but mother had not wanted to come in more often than every other week because "transportation was hard." There was no showing that mother's asserted "transportation problems" with respect to family therapy were financial or that she lacked the means to use public transportation.

As to mother's assertion that there was "ready access to professional staff" in the THU facility where unsupervised visitation was ordered to take place, at least initially, there was no evidence that a professional would be readily available at that location to intervene during visits if mother needed help. Further, there was no evidence that EMQ or another service provider would be able to accommodate unsupervised visitation at its location and support mother by providing a professional to intervene if needed. Contrary to mother's claim, the juvenile court did not implicitly find "there would be access to

23

trained assistance should the need arise."  The court's comment that THU was a contained setting was made in reference to I.V.'s tendency to run off when he became upset.  The court could reasonably conclude that such risk would be reduced if the unsupervised visits took place only at mother's residential placement and, therefore, visitation would not involve outings where I.V. might more easily run off.

"A visitation order which fails to protect a parent's right to visit is illusory.  If . . . the court grants visitation, 'it must also ensure that at least some visitation at a minimum level determined by the court itself, will in fact occur.' (*In re S.H.* (2003) 111 Cal.App.4th 310, 313.)" (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1505.)  For example, a "juvenile court cannot impermissibly delegate to the child's therapist, DCFS or any third person, unlimited discretion to determine whether visitation is to occur. (*In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1476–1478.)" (*Ibid*.)  The challenged visitation order is not illusory since the Department is obligated to allow a weekly unsupervised visit once mother complies with the court's requirements.

## DISPOSITION

The juvenile court's August 8, 2013 orders are affirmed.

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

PREMO, J.

25